ARKWRIGHT–BOSTON MANUFACTURERS MUTUAL INSURANCE COMPANY, Plaintiff–Appellee,

v.

CALVERT FIRE INSURANCE COMPANY, Bankers & Shippers Insurance Company of New York, General Fire and Casualty Company, the Chiyoda Fire and Marine Insurance Company, Ltd., the Toyo Fire and Marine Insurance Company, Ltd., Instituto De Resseguros Do Brasil, the Taisei Fire and Marine Insurance Company, Ltd., and the Asahi Fire and Marine Insurance Company, Ltd., Defendants–Appellants.

No. 1167, Docket 89–7174.

United States Court of Appeals, Second Circuit.

Argued May 22, 1989.

Decided Oct. 16, 1989.

Fredrick E. Sherman, New York City (Thomas L. Abrams, Jones, Day, Reavis & Pogue, New York City, of counsel), for defendants-appellants.

Donald T. Rave, Jr., Bigham, Englar, Jones & Houston, New York City, for plaintiff-appellee.

Before VAN GRAAFEILAND, MESKILL and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Defendants, a group of reinsurers, appeal from Judge Conner's decision awarding judgment to the plaintiff insurance company. Following a jury trial, Judge Conner held that defendants' attempted cancellation of a reinsurance contract was invalid. His ruling was based on the jury's finding that the intermediary to whom plaintiff had paid the premium was an agent for defendants and the undisputed fact that defendants had not made the requisite refund of unearned premium in attempting to cancel. We affirm.

## BACKGROUND

Plaintiff Arkwright–Boston Manufacturers Mutual Insurance Company ("Arkwright") is a member of Mutual Marine Office, Inc. ("MMO"), a pool of insurers. In 1974 MMO agreed to supply an Arkwright policy to insure a network of racetrack betting machines owned by American Totalisator, Inc. ("Totalisator"). Before issuing the Arkwright policy, MMO sought reinsurance coverage for the policy through a reinsurance intermediary, Pritchard & Baird, Inc. ("P & B").

The defendants are members of Fortress Reinsurance Managers, Inc. ("Fortress"), a North Carolina group of reinsurers with which P & B maintained accounts. Fortress issued to MMO a Certificate of Facultative Reinsurance dated at Burlington, North Carolina on September 9, 1974 reinsuring Arkwright's Totalisator policy for a 15% share of the first $1 million of any loss in excess of $500,000. The Totalisator reinsurance certificate issued by Fortress to MMO included the following cancellation clause:

This reinsurance may be cancelled at any time on a pro-rata basis by either party giving written notice to the other stating when such cancellation shall be effective as follows: (a) If the Ceding Company cancels, the cancellation shall be effective as set forth in the notice, or (b) If the Reinsurers cancel, the cancellation shall be effective not less than Thirty (30) days from the date of the sending of the notice.

The Totalisator reinsurance was to be effective from July 1, 1974 to July 1, 1977. Arkwright made the first premium payment to MMO, which issued a check to P & B covering the Totalisator reinsurance with Fortress and other reinsurance arrangements with other reinsurers. MMO paid the second installment premium to P & B on September 18, 1975, but P & B never forwarded the payment on that premium to Fortress. The principals of P & B had been diverting premiums owed to reinsurers to themselves, *see Francis v. United Jersey Bank*, 87 N.J. 15, 432 A.2d 814 (1981), and by late 1975 P & B was delinquent in its various accounts with Fortress, including the Totalisator account. P & B's bankruptcy followed.

Having detected a cessation in payments from P & B, Fortress drafted a form letter to be used to cancel accounts produced through P & B for nonpayment of premiums. Fortress sent one of these form letters to MMO with a Notice of Cancellation, which indicated that Fortress would consider the Totalisator reinsurance cancelled as of November 25, 1975 "for non-payment of premium." The cancellation notice further stated that Fortress would "consider" reinstatement of the account were the premium received in their office prior to November 25, 1975. On November 21, 1975, MMO responded by letter to Fortress stating that a gross premium on the Totalisator policy and other reinsurance policies had been forwarded to P & B and that it, MMO, considered the contract to be in full effect. Fortress replied that MMO's conclusions were incorrect and that the cancellation was still effective November 25, 1975.

In 1976, MMO forwarded various endorsements and adjustments on the original policy to Fortress. On November 11, 1976, MMO sent to Fortress a check intended as payment of, *inter alia*, the third premium on the Totalisator policy. An accompanying transmittal memo stated that the payment was "RE: Various Reinsur-

ance Accounts," and the jury found that Fortress knew or reasonably should have known that these premiums were in part applicable to the Totalisator policy. In December 1976, Fortress returned to MMO documents relevant to the Totalisator policy with a cover letter stating that the policy had been cancelled November 25, 1975 and inviting MMO to request a refund of any premiums paid after that date.

On March 2, 1977, MMO sent Fortress a "Reinsurance Notice" regarding a Totalisator claim for a fire loss and thereafter requested payment from Fortress for the 15% portion of the final settled Totalisator claim. Fortress denied MMO's claim on the ground that the reinsurance contract had been cancelled. Arkwright then commenced this action against Fortress and certain of its member reinsurers in New York Supreme Court in September 1978. The action was removed to the Southern District on May 16, 1986 and thereafter tried to a jury.

The jury found, *inter alia*, that P & B was the agent of Fortress and the defendant reinsurers for collection of premiums on the Totalisator reinsurance policy. Holding that the refund of unearned premiums is a condition precedent to cancellation of a reinsurance contract, the district court entered judgment for plaintiff in the sum of $131,031.68. Defendants then took this appeal.

## DISCUSSION

### 1. *Choice of Law*

■ Because the reinsurance contract does not specify a governing law, we address first the issue of which state law governs interpretation of the reinsurance policy.

As a federal court sitting in a diversity case, we must apply the choice of law rules of the state in which the action was brought. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York courts apply an "interest analysis" to choice of law issues involving contractual disputes, *see Intercontinental Planning Ltd. v. Daystrom,*

*Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969); *see also Hutner v. Greene*, 734 F.2d 896, 899 (2d Cir.1984), and, therefore, "the law of the jurisdiction having the greatest interest in the litigation will be applied." *Daystrom*, 24 N.Y.2d at 382, 300 N.Y.S.2d at 825, 248 N.E.2d at 582.

We believe that North Carolina has the greatest interest in his matter. The domiciliary of the parties provides no conclusive guide. Arkwright is domiciled in Massachusetts, P & B in New Jersey, and MMO and some defendant members of the Fortress group in New York. The Fortress group was organized in North Carolina, however. Moreover, the reinsurance certificate was issued there, and any obligation to perform on the reinsurance contract would seem to arise in North Carolina upon presentation of a claim to Fortress. We thus conclude that a New York court would apply North Carolina law to the contract in question here. *See Jefferson Ins. Co. v. Fortress Re, Inc.*, 616 F.Supp. 874 (S.D.N.Y.1984) (applying New York choice of law rules); *see also Fortress Re, Inc. v. Central Nat'l Ins. Co.*, 595 F.Supp. 334 (E.D.N.C.1983) (applying North Carolina choice of law rules), *rev'd on other grounds*, 766 F.2d 163 (4th Cir.1985) (expressly agreeing with district court's application of North Carolina law).

### 2. *Policy Cancellation*

■ We now address the validity of Fortress's attempted cancellation of the reinsurance policy. The jury found that P & B was Fortress's agent and that P & B had received the premiums in question. Fortress does not challenge that finding. Under North Carolina law, payment of a premium to an insurer's agent is a valid premium payment on an insurance contract, whether or not the insurer knows of the payment. *See Allstate Insurance Co. v. Hale*, 270 N.C. 195, 154 S.E.2d 79 (1967) (where broker was agent of insurer, payment to agent constituted payment to insurer, and policy cannot be cancelled for nonpayment of premium).

Fortress claims that this rule should not apply in the case of reinsurance contracts because reinsurance typically involves contracts between large companies that do not call for the exceptional protections afforded individual purchasers of primary insurance. *See, e.g., In re Pritchard & Baird, Inc.,* 8 B.R. 265, 270–71 (D.N.J.1980) (consumer protection statute for insurance not applicable to reinsurance); *Stonewall Ins. Co. v. Fortress Reinsurers Managers, Inc.,* 83 N.C.App. 263, 350 S.E.2d 131, 134–35, *review denied,* 319 N.C. 410, 354 S.E.2d 728 (notice requirement different in reinsurance context); *Great American Ins. Co. v. Fireman's Fund Ins. Co.,* 481 F.2d 948, 954 (2d Cir.1973) (canon that ambiguous language should be interpreted against insurer does not apply to reinsurance). However, the rule that payment to an agent constitutes payment to the principal involves no public policy considerations peculiar to insurance contracts but is derived largely from common law principles of actual or apparent authority. The jury having found that P & B was Fortress's agent for purposes of receiving premiums, the premium in dispute is thus deemed to have been paid to Fortress.

■ In the event of wrongful cancellation of an insurance contract an insured may generally elect to treat the policy as still in force and continue to tender premiums, as was done in this case. Should there be an occurrence triggering the policy, the insured may file a claim and, if necessary, sue for recovery under the policy. *See* 45 C.J.S. *Insurance* §§ 462, 463; 34 A.L.R.3d 245 at § 12 (1970); *see also American Trust Co. v. Life Ins. Co.,* 173 N.C. 558, 92 S.E. 706 (1917); *Kenyon v. National Life Ass'n,* 39 A.D. 276, 57 N.Y.S. 60 (1899). It is true that the decisions regarding election of this remedy for wrongful cancellation typically involve primary insurance contracts rather than reinsurance contracts. Fortress therefore again argues that reinsurance contracts should be subject to different rules.

We perceive no reason, however, to deprive a reinsured of the remedy of continuing to tender and to treat the policy as in effect simply because it is an insurance company. Given the jury's resolution of the agency issue, Arkwright had fully performed, and Fortress, being deemed to have received the premium, could not rightfully have cancelled for nonpayment. If Arkwright could not continue to treat the policy as in effect, it would effectively have received nothing in return for its premium because litigation to recover that premium would, absent a claim on the policy, cost far more than the premium itself, here less than $4,000. As the discussion *infra* indicates, Fortress could have protected itself by cancelling the policy and refunding the unearned premium to Arkwright. We believe, therefore, that a reinsured may elect to treat a policy as in effect and continue to tender premiums when confronted with a wrongful cancellation for nonpayment. Arkwright thus prevails on the cancellation issue so far as the nonpayment of premiums is concerned.

Fortress also argues that their notice of cancellation was effective to terminate the reinsurance policy on grounds other than nonpayment of premiums. As noted, the cancellation clause of the reinsurance agreement provided that the reinsurance could be cancelled "at any time on a pro-rata basis by either party" upon specified notice conditions. Fortress argues that this clause permits cancellation for any or no reason at all and that the attempted cancellation was effective notwithstanding the failure to return the unearned premium.

■ Arkwright argues that Fortress waived its right to claim that the cancellation was for any reason other than nonpayment of premium. It is a general principle of insurance law, however, that the proffering of a reason for cancellation does not limit the insurer to that cause where another valid cause exists. 17 G. Couch, *Couch on Insurance* § 67:70 (2d ed. 1983); *see also* 6A J. Appleman, *Insurance Law and Practice* § 4185 (1972).

■ We therefore turn to the question of whether a cancellation of a reinsurance policy for reasons other than nonpayment may be effective without the return of a

premium. The general rule is that return of unearned premiums is a condition precedent to cancellation of an insurance policy, *see generally* 6A J. Appleman, *Insurance Law and Practice* § 4189 (1972); 45 C.J.S. *Insurance* § 451, except where the insurance contract specifies otherwise. *See Hayes v. Hartford Accident & Indemnity Co.*, 274 N.C. 73, 161 S.E.2d 552 (1968). The cancellation clause in the reinsurance agreement at issue states only that cancellation shall be on a "pro-rata" basis. Although this language clearly contemplates that the reinsured will be entitled to any paid but unearned premium in the event of cancellation, it does not expressly state whether cancellation is effective without the contemporaneous refund of unearned premiums. Nevertheless, the clause is anything but an express departure from the general rule that refund is a condition precedent to cancellation.

Fortress argues that the general rule requiring refund does not apply here because North Carolina disfavors conditions precedent. *See, e.g., Harris–Teeter Supermarkets, Inc. v. Hampton*, 76 N.C.App. 649, 334 S.E.2d 81, 83, *review denied*, 315 N.C. 183, 337 S.E.2d 857 (1985); *Howard v. Federal Crop Ins. Corp.*, 540 F.2d 695, 697 (4th Cir.1976); *Darden v. Houtz*, 234 F.Supp. 261, 267 (E.D.N.C.1964), *aff'd*, 353 F.2d 369 (4th Cir.1965). However, these cases involve conditions precedent to performance rather than to cancellation of a contract. A rule disfavoring conditions precedent to performance encourages the carrying out of contractual obligations and the avoiding of a forfeiture, whereas a rule disfavoring conditions precedent to cancellation would discourage performance and encourage forfeitures. *See generally* 17 Am.Jur.Contracts § 321 at 752 (1964 & Supp.1989). These cases are thus distinguishable.

Fortress also argues again that the general rules governing primary insurance are inapposite in the case of reinsurance, and that the rule requiring refund of unearned premiums is not applicable to the present case. Unfortunately, we lack direct guidance from North Carolina caselaw on this issue. We therefore turn to general principles to predict how North Carolina would resolve it.

In the primary insurance context, a failure to refund an unearned premium could leave an insured individual without funds to purchase new insurance and allowing cancellation without a refund would be harsh. However, the rule is not based solely on the need of an individual insured for funds to purchase more insurance but is an equitable doctrine applicable to insurance and reinsurance contracts alike. *See* 6A J. Appleman, *Insurance Law and Practice* § 4189 at 581 (1972); *see also Gosch v. Fireman's Fund Ins. Co.*, 33 Pa.Super. 496 (1907). We believe it applies in the circumstances of this case.

Where a reinsurance intermediary accepts premiums from a reinsured and diverts them to itself, both the reinsurer and the reinsured are left in a state of uncertainty. Confusion may exist as to which premiums on which policies have been diverted. Untangling these facts is made more difficult by the use of multiple intermediaries and the payment of premiums by a single check covering numerous policies involving different reinsureds and different reinsurers.

The uncertainty extends to the companies' legal protections and obligations as well. If the intermediary is the reinsured's agent, then the policy may be cancelled for nonpayment. The rub of course is that, absent a settlement, the agency issue can be resolved only in litigation well after a claim is made and thus depends upon the view of a future trier of fact that may be quite unpredictable. As happened in the present case, reinsureds will not pay to cover the missing premium since that second premium can be recovered only through litigation over the agency issue costing far more than that premium. Reinsurers will not refund a premium they have in fact never received and will seek to cancel the contract for nonpayment. If the reinsured continues to tender, the reinsurer will continue to protest that the contract is not in effect but will retain the premiums because it still does not know whether its cancellation is valid. A further difficulty

arises in that the reinsured may be uncertain as to which policies the tendered premiums are to be applied. Of course, the reinsurer will invite the reinsured to ask for a refund, an invitation that, if accepted, would release the reinsurer.

If there is no claim on a policy, the matter will be forgotten except perhaps for a meager recovery in the intermediary's bankruptcy proceeding. The reinsured, having maintained all along that the policy was in effect, would be in a difficult position to seek return of the embezzled premium from the reinsurer after the need for insurance had passed. The reinsurer, having claimed all along that the policy was cancelled, would hardly initiate litigation to recover from the reinsured premiums that went down with the intermediary.

Absent an occurrence triggering the policy and a subsequent claim, this transitory situation is liveable. Should either the reinsured or the reinsurer regard the risk of an occurrence followed by an adverse ruling on the agency issue as excessive, it can seek protection. A reinsured may thus purchase alternative insurance, or a reinsurer may pay the pro rata share of the received premium to the reinsured and cancel its obligations. Each is able to calculate the risk against the cost of protection.

If these protective acts are not utilized and there is an occurrence and a claim, then the agency issue must, absent a settlement, be resolved. Where the agency issue is decided adversely to the reinsurer, we believe that it is entirely proper to hold the reinsurer to the obligations of the reinsurance contract unless its attempted cancellation was accompanied by a refund of unearned premium. The agency issue having been resolved against it, the reinsurer must rely on its right to cancel for any or no reason, but the failure to refund the unearned premium is difficult to justify unless the ground for cancellation is nonpayment of the premium. A rule requiring a refund imposes little hardship on the reinsurer. Whatever confusion may exist as to what has or has not been paid, the reinsurer can easily determine the amount of the missing premium and repay the pro rata share. We believe that it is highly unlikely that North Carolina would adopt a rule that allowed reinsurers to cancel on grounds other than nonpayment of premium—for example, an unexpected increase of risk—and to retain even for a time unearned premiums that are not worth the cost of litigation to the reinsured.

Our resolution of this case thus allows reinsurers and reinsureds whose contractual relationship is disrupted by a defalcating intermediary to stand pat (unless they view the risk as too great and take protective measures) and litigate the agency issue only when there has been a claim. Whether this is the most efficient rule is difficult to tell. Efficiency is difficult to maximize when the legal relationship of the parties depends upon unpredictable findings by a future trier of fact. A legal rule that provided certainty by automatically allocating the burden of loss to either the reinsured or reinsurer, absent contractual provisions to the contrary, would reduce litigation costs, and the parties could adjust premium rates accordingly. It might even make no difference which party bore the risk, because neither appears to be in a superior position to avoid the risk of loss. Reinsurers may be the first to notice an interruption of the stream of payments from an intermediary, but they are not in a good position to determine who has paid the various intermediaries.

A rule providing such certainty might, however, create disincentives for the non-liable party in selecting trustworthy intermediaries, a problem that is avoided by having the payment issue turn on the determination of whose agent the defalcating intermediary was. In any event, we are confident that North Carolina would make the agency determination dispositive, and that precludes us from adopting a rule automatically allocating liability as of the time of loss. Nothing, however, prevents reinsurers and their reinsureds from adopting by contract a more efficient means of dealing with this problem.

Given our view of the merits, Fortress's claim that Arkwright should have mitigated damages by purchasing more reinsur-

ance and that it, Fortress, is liable only for the cost of that insurance is rejected.

Affirmed.